## Grove's *versus* Donaldson.

1. A party who dispenses with or prevents performance of a contract, written or verbal, cannot take advantage of the non-performance by the other.

2. Where it was agreed that defendants would deliver to the plaintiffs a certain quantity of ore, which was to be the ore mined by E. B. on the lands of either Montgomery or Frick; and the plaintiff afterwards informed E. B., who was mining for defendant, that he would not receive any more ore from the Montgomery mine; and it appearing that there was sufficient ore in the Montgomery mine to fulfil the contract, and that a fault existed in the Frick mine, which rendered it expensive to work, the defendants were thereby excused from delivering any more ore.

3. A contract may be abandoned otherwise than by words; the conduct of the parties, and their situations to each other, may be considered by the jury in determining whether, by mutual consent the contract was treated as ended; and that the matter has been suffered to rest for three years is evidence to the jury as to a presumed abandonment.

4. It was not error for the court to instruct the jury that the testimony of E. B., the miner, was important in the case, on the ground that he was the person, mentioned in the agreement, who was to mine the ore which was the subject of the agreement.

5. A refusal to receive ore, made to E. B., who was named in the agreement as the person who was mining the ore which was the subject of the agreement, and who was employed by defendants in the work, is a refusal to his principals; and notice to them of the refusal would be unnecessary.

6. Where a person had the right, under an agreement to deliver ore, to take it from either of two mines, from one of which the plaintiff refused to receive ore, and a fault existed in the other, rendering it expensive to work, it was not error for the court to say to the jury that it may be considered a hard case, under the circumstances, to subject the defendant to heavy damages.

7. Though a receipt given by defendants may imply an understanding of the parties that ore was to be afterwards delivered, yet it is not conclusive; and the attention of the jury may be directed also to other evidence in the cause, to determine, from the whole evidence, whether the contract relative to the delivery of ore was or was not ended.

ERROR to the Common Pleas of *Columbia county.*

This was an action of assumpsit, by J. P. & J. Grove, partners, against William Donaldson and John McQuhae, (the latter of whom died after the commencement of the action,) to recover liqui-

[Grove's *v.* Donaldson.]

dated damages at the rate of $2 per ton, for not delivering 753 tons of ore. The pleas were non-assumpsit, payment with leave, and set-off. The agreement was as follows:—

Articles of an agreement made and concluded this thirtieth day of July, one thousand eight hundred and forty-five, between Donaldson & McQuhae, merchants, of Danville, of the first part, and J. P. & J. Grove, ironmasters, of the same place, of the second part—Witnesseth, that the said Donaldson & McQuhae, the party of the first part, agree to sell and deliver to the said Groves, the party of the second part, fifteen hundred gross tons, of 2240 lbs. per ton, of good soft ore; which is to be the ore mined by Edmund Bullock, on the lands of Alexander Montgomery, George A. Frick, Wm. H. Magill, and Jacob Hibler, where said Bullock is now engaged in mining; the said ore to be delivered at Columbia furnace, in good order, and mined clean, and free from dirt, slate, and other impurities. The said party of the first part agree to deliver it, regularly, at the rate of thirty tons per week; and commence delivering with the date of this article of agreement, and continue to deliver it at that rate until the whole quantity is delivered. And, in consideration of which, the party of the second part agree to pay for each and every ton gross, of 2240 lbs., so delivered, two dollars per ton, of 2240 lbs., as said before—that is: one dollar per ton, cash, monthly, and the balance, one dollar per ton, is to be charged in account; and, at the expiration of one year, when it is presumed the ore is all delivered, give their negotiable note to the party of the first part, payable six months after date. If any of said ore should not be mined clean, and not be delivered in as good order as aforesaid, the party of the second part have the right to refuse to receive such load or loads. The party of the first part agree to bind themselves to the party of the second part to deliver the full quantity of said ore, and in such time as agreed upon; and for each and every ton not so delivered, in the within specified time, the said Donaldson & McQuhae agree to pay, at the end of the year, to the said Groves, two dollars per ton as liquidated damages; and the party of the second part agree to bind themselves to the party of the first part to pay also two dollars per ton, liquidated damages, for each and every ton that they may refuse to receive, if mined as clean and delivered in as good order as aforesaid.

It is agreed that if the party of the first part should not be able to deliver regularly thirty tons per week, on account of bad roads or obstructions in mining, it is agreed that they may make said quantity up afterwards, so as to average said thirty tons per week. The name "Alexander Montgomery" was interlined before signing; also the word "average" in place of "equalize," erased; the word "otherwise" erased.　　DONALDSON & McQUHAE,
　　　　　　　　　　　　　　　　　　　J. P. & J. GROVE.

[Grove's *v.* Donaldson.]

On part of plaintiffs a receipt, as follows, was read :—

Received, 7th March, 1846, of J. P. & J. Grove, thirty-six tons and fifteen cwt. of pig-iron, delivered to sundry persons, as per our orders ; and fifteen dollars per ton we consider having received on account of cash—part of soft ore delivered as per agreement, dated 30th July, 1845, amounting to the sum of five hundred and fifty-one $\frac{25}{100}$ dollars ; the balance, over and above the fifteen dollars per ton, considered as cash, is to be charged by said Groves in their account against us, or for which we are to credit them in our books.

$551.25 paid cash on account of soft ore.

DONALDSON & McQUHAE.

Receipt as follows read :—

Received, 30th March, 1846, of J. P. & J. Grove, five tons of " A" No. 1 pig-iron, out of which fifteen dollars per ton is to be accepted by us as paid in cash—part of soft ore delivered by us— say seventy-five dollars.

$75.                          DONALDSON & McQUHAE.

Receipt as follows read :

Received, 16th June, 1846, of J. P. & J. Grove, thirty-five tons of " A" No. 1 pig-iron, delivered to our orders, as follows, to wit : Ten tons to Moore & Biddle, 7th April, 1846 ; five tons to do., 16th April, 1846 ; ten tons to do., 13th May, 1846 ; ten tons to do., 8th June, 1846 ; out of which iron we consider as *having re-*ceived fifteen dollars per ton as cash on iron-ore *to be delivered* by us to said Groves, as per agreement of 30th July, 1845.   The balance of the said iron per ton, over and above the fifteen dollars, is to be charged in account against us—say thirteen dollars per ton, amounting to $455.

Thirty-five tons of iron, at $15 per ton, considered as cash, and to be received as paid in cash ; part of said iron-ore, *to be delivered,* as per said contract of 30th July, 1845, amounts to five hundred and twenty-five dollars.

The balance of said iron is to be charged against us—that is, over and above the fifteen dollars per ton, allowed as cash—say $13 per ton, amounting to $455.

$525.                          DONALDSON & McQUHAE.

On the part of defendant, *Edmund Bullock* was sworn.—I commenced first at Mr. Montgomery's, in the fall of 1844, or in October. In August, 1845, I mined at Frick, Hibler, Magill, and Montgomery's too.   *I was employed by Donaldson & McQuhae.*   I mined in September, in the same mines, and in October, and in November, and in December, till February.   Mr. Groves got the ore that I mined in those mines.   Grove did not get all the ore that I mined in the Montgomery vein at that time by 30 tons. Grove told me that those 30 tons of ore were too dirty and too wet.

. [Grove's *v.* Donaldson.]

He said he would not take that. He did not say we should or should not mine, *but he would not take any more from the Montgomery vein ; he said it was too dirty. The ore was as clean as it could be made by hands ;* they had taken all the lumps out of it; *no better ore could have been taken out of the Montgomery mines ;* 70 or 80 tons yet might have been got out of the Montgomery mines—out of the two drifts of the Montgomery mines. Grove told me this in Danville, at his office ; *I did not say any thing to Donaldson & McQuhae.* This ore was afterwards bought by Samuel R. Wood—the 70 or 80 tons. Samuel R. Wood got the 30 tons which were mined. These 30 tons were a part of the 70 or 80 tons. *Grove afterwards got ore out of the same mine.* I believe he is getting ore out there now. It was in the beginning of November or December, 1846, Grove told me this; it would be in 1845. I went to Mr. Wood's, March 28th, 1846 ; this was the November or December before I went to Mr. Wood's. In the Montgomery mine, the hard and soft lumps were taken away by Mr. Grove; that which was left was the soft mushy stuff, such as could not be handled by the hand. I mined in the Frick & Hibler mine in August, 1845, until next January, for Donaldson & McQuhae. Mr. Grove got that ore. The reason I mined there no longer was, I got into a fault; a fault is where no more ore can be got out without a sight of expense. The ore was cut off by the slate ; the ore was not quite all taken out to this fault ; a little was left. I did not say what time I came to this fault; I think it was about January; it would take three or four months to get through that fault. It would have taken eight or nine months to have put a drift in on a lower level, and strike the vein below. Absalom Diehl was one of the carters that hauled ore from the Montgomery mine. I told him (Grove) that the miners could not get it any cleaner than we did. I have worked 18 years at mining; 10 years mining ore in this region, &c. &c.

Absalom Diehl.—I hauled ore from the Montgomery mine to Grove's furnace. Bullock mined it. I commenced hauling in the fall of 1845. The soft ore was wet, and Peter Grove found fault with it, and said I should bring the hard, and pick out that. There was some called limestone ore, and some soft ore, came out in blocks; I was to haul these. It appears to me I did take several loads that way, and Mr. Bullock told me at last that if I did not take the soft ore, I should stop hauling the hard. I was employed to haul by Donaldson & McQuhae. *It appears to me that I did tell Donaldson & McQuhae what Grove told me, but I won't be certain. I am not certain, but I think I told McQuhae.*

Cross-examined.—It was the ore I hauled from Montgomery's that Grove found fault with: I don't think that Grove found fault with the ore I hauled from Frick and Magill's.

After defendant had closed, plaintiffs called F. Bubb, and on

[Grove's *v.* Donaldson.]

his examination, it was proposed on their part to ask him whether or not there was plenty of soft ore on the Frick, Hibler & Magill tract in 1847. Counsel for defendant objects. to the question, because the agreement was that the ore was to be mined in the mines ·that were worked by E. Bullock. The court sustained the objection, and counsel for plaintiffs excepted.

ANTHONY, J., charged the jury, *inter alia*, that "the testimony of Edmund Bullock is important in the case, on the ground that he was the person mentioned in the agreement who was to mine the ore on the lands of Montgomery and others; also, that the jury will observe that this may be considered a hard case, as the plaintiffs ask for liquidated damages," &c., [as stated in the third assignment of error.] For some other parts of the charge, see assignments of error.

On the part of plaintiffs, several points were submitted. The third point was that even if the jury should believe that one of the plaintiffs told Edmund Bullock, the miner of the defendants, that a part of the ore mined on the Montgomery tract was dirty, and too wet, and that he would not take it, and when told that the miners could not get it any cleaner, said he would not take any more from the Montgomery vein—that it was too dirty—yet this would not excuse Donaldson & McQuhae from the performance of their contract to deliver 1500 tons within the time specified in the article of agreement; and, more especially, as there is no evidence that these declarations were communicated to Donaldson & McQuhae.

Answer by the court.—Where a contract is made for the performance of certain acts, the *promisor* will be discharged from his liability if the other party do any act which renders it impossible for the former to perform his engagement, or omit to perform some act necessary to *be performed on his*, the promisee's part; and in such case the promisor stands in the same situation *as though* the performance of the contract had been perfected. By the terms of the agreement, Donaldson & McQuhae agreed to sell and deliver to the Groves fifteen hundred tons of good soft ore, to be the ore mined by Edmund Bullock on lands of Alexander Montgomery, and of Frick, Magill & Hibler, where Bullock was then engaged in mining. It was to be delivered in good order, and mined clean and free from dirt, slate, and other impurities. Edmund Bullock was to mine the ore. He ·did so, and says it was as clean as it could be made by hand. "No better ore could have been taken out of the Montgomery vein." What was got out by him, that was refused by Grove, was afterwards bought by Samuel R. Wood. He also says that Grove complained that the thirty tons of ore, afterwards got by Wood, were too dirty and too wet—that Grove said he would not take that—"*He would not take any more from the Montgomery vein.*" Grove said it was too dirty. The teamsters

[Grove's *v.* Donaldson.]

had taken all the lumps out of it. Thomas Bullock also testifies that he called the ore in the Montgomery vein good ore. He mined in that mine in 1845 and 1846, and says that no better ore could have been got out of that mine—neither better nor cleaner. Now, if the jury believe that the ore which Grove refused to take from the Montgomery vein was "*good soft ore*," and that Bullock took it out as clean as it could be made by hands; that no better ore could have been got out of the Montgomery mine, although it was of the soft kind,—this refusal of Grove to take the ore would excuse Donaldson & McQuhae from the performance of their contract to deliver fifteen hundred tons within the time specified in the article of agreement; *and as Edmund Bullock was the person who was to mine for Donaldson & McQuhae by the terms of the agreement, it is of no consequence whether the declarations of Peter Grove were communicated to Donaldson & McQuhae or not,* if Edmund Bullock, in consequence of Grove's declaration that he would receive no more from the Montgomery vein, quit working for Donaldson & McQuhae, and left the mine.

4th point.—That there is no evidence in this cause of any acts done or declarations made by either of the plaintiffs, that would excuse Donaldson & McQuhae from the performance of their contract to deliver the fifteen hundred tons of soft ore, and the verdict of the jury ought to be for the plaintiffs.

Answer.—The court refuse to answer this point as requested, and for a full answer thereto refer to our answer to the third point.

5th point.—That the verdict of the jury ought to be in favor of the plaintiffs for the sum of $1163.25.

Answer.—The court refuse to answer this point as requested, and leave the matters of fact to the jury.

On the part of defendant, points were submitted.

1st point.—That if the jury believe that in November or December, 1845, J. P. Grove told Edmund Bullock, the man selected by the parties to the agreement as the person to mine the ore, that he would not take any more ore from the Montgomery mine; that having thus refused to accept that ore, plaintiffs cannot recover damages of defendants for not delivering the whole fifteen hundred tons.

To the first point the court answer in the affirmative.

2d point.—That if Grove told Bullock that he would not accept any more ore from the Montgomery mine, the defendants were relieved from their contract to deliver any more ore.

To the second point the court answer in the affirmative.

3d point.—Even if the jury believe that defendants delivered some ore after the refusal by plaintiffs to accept the ore mined from and in the Montgomery mine, it does not relieve the plaintiffs from the effect of their refusal.

To the third point, the court answer :—The acceptance of ore

M

[Grove's *v*. Donaldson.]

from the mine of Frick, Magill & Hibler, after the refusal by plaintiffs to accept the ore mined from and in the Montgomery mines, would not relieve the plaintiffs from the effect of said refusal, provided that Donaldson & McQuhae were prevented thereby from furnishing a sufficient quantity of ore to the plaintiffs. Donaldson & McQuhae had a right to take out "good soft ore" either from the mine of Montgomery, or of Frick & Co., and if the Groves refused to take ore out of the Montgomery mine, Donaldson was thereby released from delivering the whole quantity out of the mines of Frick & Co.

4th point.—That if the jury believe that plaintiffs told Absalom Diehl to pick out the hard ore and lumps and leave the soft ore mined in the Montgomery mines, and that Diehl told the same to the defendants, it is such an interference with and violation of the contract by the plaintiffs as released defendants from the further performance of the contract.

To the fourth point the court answer :—That the telling of Absalom Diehl, by the plaintiffs, to pick out the hard ore and lumps and leave the soft ore mined in the Montgomery mines, is *not* such an interference with and violation of the contract of plaintiffs as would release defendants from the further performance of the contract, although Diehl communicated the same to the defendants ; but the refusal of the plaintiffs to take any more ore from the Montgomery mines would have that effect.

Verdict was rendered for defendant.

It was assigned for error that the court below erred,

1st. In refusing to permit the question by plaintiffs as per their bill of exception.

2d. In charging the jury, 1st. That " the testimony of Edmund Bullock is important in this cause, on the ground that he was the person mentioned in the agreement who was to mine the ore on the lands of Montgomery and others."

2d. That " if they believed that the ore taken out by Bullock was good soft ore, and that Groves refused to receive it, and in consequence thereof Bullock quit mining for Donaldson & McQuhae, so that they could not perform their part of the contract, then Donaldson & McQuhae would be relieved from their part of the contract, and were not bound to continue to offer ore to the acceptance of the Groves, but in consequence of the refusal of Groves to take the ore from the Montgomery mines, Donaldson & McQuhae might treat the contract as at an end."

3d. That " this might be considered a hard case, as the plaintiffs ask for liquidated damages at the rate of $2 per ton for not delivering 753 tons of ore, which was the same price Donaldson & McQuhae were to get for delivering it to J. P. & J. Grove. The miner had run foul of a fault, and was stopped from getting out

[Grove's *v.* Donaldson.]

ore in the Frick & Co. mine, on account of the slate-rock, which stopped his progress, and Grove told Bullock that he would not take any more from the Montgomery vein.　We therefore instruct you that if the plaintiffs interfered with the contract, and prevented the defendants from delivering good soft ore, from the Montgomery vein, by the refusal to accept it from the miner, such refusal would discharge Donaldson & McQuhae from their obligation to deliver the ore according to the terms of the contract."

4th. That "it is alleged by the counsel for the plaintiffs that this receipt (receipt dated June 30, 1846) shows that the contract was still in force when the receipt was given.　Of this the jury will judge when they take it, together with the other testimony in the cause, into consideration.　The receipt speaks of ore to *be delivered*, and would imply ore which was to be delivered by Donaldson & McQuhae to the Groves, but there is other evidence in the cause, which the jury will also consider, and determine from the whole evidence, whether the contract was or was not ended, from what took place between the parties."

5th. In their answers to plaintiffs' third, fourth, and fifth points.

6th. In their answers to defendant's first, second, and third points, and in the last sentence of their answer to defendant's fourth point.

*Comly* and *Baldy* were for Grove and Grove, plaintiffs in error.
*Pleasants*, for defendant in error.

The opinion of the court was delivered August 1, by

ROGERS, J.—This is an action of assumpsit, to recover liquidated damages for the non-performance of a written contract.　It is not pretended by the defendant that the agreement was performed on his part, but he insists that performance was prevented by the acts of the plaintiff himself.　If so, the defendant has a complete defence to the action, as it is unquestionable that one party may show by parol that the other party has waived or prevented performance of a contract, either written or parol.　A party who dispenses with or prevents performance of a contract, cannot take advantage of the non-performance by the other: 4 *United States Dig.* 84 pl. 503, 11 *Shep.* 36 ; 7 *United States Dig.* p. 31, pl. 222; 4 *id.* 93, pl. 688.　The defendant agreed, for a certain stipulated price, to sell and deliver to the plaintiff for the sum and at the time mentioned in the contract, fifteen hundred tons of good soft iron ore, to be the ore mined by Edmund Bullock, on the lands of Alexander Montgomery, George A. Frick, W. H. Magill, and Jacob Hibler, where said Bullock is now engaged in mining.　It is very plain it was the intention of the parties that the defendant should have the liberty of selecting the ore of the quality described, from either the Montgomery or the Frick mine.　His range was not con-

[Grove's *v.* Donaldson.]

fined to one or the other, but if he took the ore from any ore-veins worked by Bullock, (provided it answered the description of good soft ore,) it was a full compliance with the stipulation in the contract.   It was a matter of no consequence to the plaintiff from which the ore was taken, provided it was of the quality agreed upon ; but it was of the first importance, as the event showed, that the defendant should not be confined, except within the prescribed limits.   It was of serious detriment to him to be compelled to raise the ore from the Frick mines, as taking it from those mines was attended with an increased expense, arising from the fault of which the witnesses speak.   Had there been no interference with the unquestionable right of the defendant to mine in the Montgomery vein, the contract may have been performed to the letter, by the delivering in due and proper time, the whole amount of ore plaintiff was entitled to receive.   It must be remarked, there was plenty of ore in Montgomery's mine to fulfil the contract, and it is in proof that upwards of one thousand tons were taken from that mine, by the plaintiff himself, since the defendant ceased to deliver ore in pursuance of the agreement.   The court was, therefore, right in ruling, that if the plaintiff interfered with the contract, and prevented defendant from delivering *good soft ore*, from the Montgomery vein, by his refusal to accept it from the mine, such refusal would discharge Donaldson and McQuhae from their obligation to deliver the ore according to the terms of the contract.   This was the point on which the whole cause turned, and this point was properly referred to the jury.   The jury have found, that the defendant tendered good soft iron ore, such as is described in the contract; that the plaintiff refused to receive it, declaring at the same time that he would not take any more from the Montgomery vein.   His excuse was, it was too dirty, although the witness deposes it was as clean as it could be made by hands.   Nor will it alter the case, that after the refusal, the defendant mined and delivered ore from the Frick vein, until he came to a fault, which, (in the apprehension of the miner, in whose experience the parties appear to have placed confidence,) could not be pierced without great expense.   Under these circumstances, the defendant was at liberty to consider the contract at an end, inasmuch as plaintiff had himself interfered with the contract, by refusing, improperly, to receive ore from the Montgomery vein.   The defendant was warranted in the belief that the plaintiff meant what he said ; and if so, that it would be needless to tender ore from that mine, which had been before peremptorily refused.   And this would seem to have been the understanding of both parties.   We hear of no remonstrance on their part for the non-fulfilment of the contract.   The matter is suffered to rest for three years, which of itself is strong evidence, from which the jury might presume a mutual abandonment : 7 *Scott* 395, TINDAL, C. J. BOSANQUET, J., says, contracts may be abandoned otherwise than

[Grove's *v.* Donaldson.]

by words; the conduct of the parties and relative situations to each other are to be considered: COLTMAN, J. I think the jury might well conclude that by mutual consent the contract was treated as ended. The court was justified in instructing the jury that if they believed the ore was good soft ore, and Grove refused to receive it, and that in consequence of it Bullock quit mining, defendants would be released from their contract, and would not be bound to continue to offer ore to Grove. It is difficult to account on any hypothesis but the abandonment of the contract, for the sudden ceasing to deliver ore, after Grove's declaration to Bullock, the great length of time that elapsed without one word of complaint, and the settling in the most friendly manner, a short time after, the price of pig-iron received in payment by defendants as cash for the ore delivered.

But it is strenuously contended, the court erred in instructing the jury that the testimony of Edmund Bullock is important in this cause, on the ground that he was the person mentioned in the agreement, to mine the ore on the land of Montgomery and others. I am free to confess that my first impressions were that the court had laid too much stress on the testimony of Bullock, but on further reflection, I have been inclined to change the opinion first formed. The defendant bound himself to deliver to the plaintiff fifteen hundred tons of good soft ore, in good order, mined clean and free from dirt, slate, and other impurities, to be the ore mined by Edmund Bullock, on the lands of Alexander Montgomery, George A. Frick, William H. Magill, and Jacob Hibler, where said Bullock is now engaged in mining; the said ore to be delivered at Chambers's furnace, in good order, and mined clean and free from dirt, slate, and other impurities. That part of the agreement is certainly not very explicit, but I am inclined to adopt the reading of the defendant's counsel. The parties would seem to have put great trust and confidence in Bullock, because, I suppose, he was an experienced miner, who had been engaged in the business for many years, and was, no doubt, by reputation at least, well known to both. He was, therefore, constituted in some measure the agent of both in it, as well as the organ of communication between the parties. Unless this was the case, it is difficult to understand why his name was introduced into the agreement at all, as it would not be needed for purposes of designation, as the mines were sufficiently described by the appropriate names of the Montgomery and Frick mines. If this be so, the court was right in considering his testimony as important, for a refusal to receive the ore from him is the same as if the refusal had been made directly to the defendants themselves. Notice to them would be unnecessary. Indeed, proof of a refusal to him, who certainly was their man of business, would raise an almost uncontrollable presumption that it was communicated to his principals.

[Grove's *v.* Donaldson.]

The counsel for the plaintiff in error, contended that the court had no right to charge the jury that this was a hard case.   He justly says the agreement was fairly entered into by the parties, without surprise or imposition of any kind practised by either ; each party is equally stringently bound, and the stipulations are of such a nature, that either party could easily fulfil their part of the contract to the letter, if they had endeavoured in good faith to do so. If the court had, as the counsel supposes, charged the jury it was a hard case merely because the damages were liquidated, it would be obnoxious to the objection made ; but I do not so understand the court.   They say it was a hard case in view of all the circumstances, viz. that the  miner had run foul of a fault and was stopped from getting out ore, in the Frick & Co. mine, on account of the slate-rock, which stopped his progress, and that Grove told Bullock he would not take any more from the Montgomery vein.   To subject the defendant, as is clear, to heavy and exorbitant damages, under such a state of facts, would not only be hard, but oppressive.   In this instruction I fail to perceive any injury of which the plaintiffs can justly complain.

In the argument, great stress was laid on the receipt of the 16th June, 1846, showing, as the plaintiff contends, that the contract was still in force when the receipt was given.   The construction of the receipt, as far as it went, was favorable to the plaintiff in error, but the court properly referred it together with all the other testimony in the cause, to the jury.   The court say the receipt speaks of ore to be delivered, and would imply ore which was to be delivered by Donaldson & McQuhae to the Groves, but there is other evidence in the cause, which the jury will also consider, and determine from the whole evidence whether the contract was or was not ended ; they will determine from what took place between the parties.   Had the court undertaken to say that the receipt was of itself conclusive evidence that the contract was then a subsisting contract, it would have been erroneous, as undoubtedly it was their duty to refer that fact, with the attending circumstances, to the jury.

On a careful examination of the whole case, no error is perceived which would justify the court in reversing the judgment.

Judgment affirmed.