Sam KADEMENOS

v.

**EQUITABLE LIFE ASSURANCE SO-CIETY OF the UNITED STATES, a corporation, Appellant.**

No. 74-1128

United States Court of Appeals, Third Circuit.

Submitted on Briefs Under Third Circuit Rule 12(6) Sept. 9, 1974.

Argued Jan. 8, 1975.

Decided April 9, 1975.

Thomas Lewis Jones, Richard C. Witt, Jones, Gregg, Creehan & Gerace, Pittsburgh, Pa., for appellant.

Anthony V. DeCello, Joseph D. Talarico, DeCello, Bua & Manifesto, Pittsburgh, Pa., for appellee.

Submitted Under Rule 12(6)
Sept. 9, 1974.

Before KALODNER, ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The conduct of competitors in the insurance marketplace claims our attention on this appeal in which we are asked to determine whether the acts of the defendant come within the privilege to interfere with the contractual relations of a competitor. Plaintiff, an insurance agent, seeks to recover the commission he would have received on the issuance by Jefferson Standard Life Insurance Company (Jefferson Standard) of a one million dollar policy which, as a result of the alleged interference of the defendant Equitable Life Assurance Society (Equitable), was cancelled by the insured. This diversity case was tried to a jury which returned a verdict for plaintiff in the amount of $27,000 upon which judgment was entered in the United States District Court for the Western District of Pennsylvania. The district court denied Equitable's motions for a directed verdict and for judgment notwithstanding the verdict. Equitable appealed;[1] we reverse.

■ Since plaintiff has the benefit of a jury verdict, in reviewing the district court's denial of Equitable's motion for judgment notwithstanding the verdict, we must consider the evidence in the light most favorable to plaintiff, drawing all reasonable inferences in favor of

1. Upon notice that this case was to be submitted under Rule 12(6) of this court, Equitable moved for leave to file a reply brief, appending a copy thereof for the information of the court. We have considered the reply brief in our deliberations and, in an order accompanying this opinion, grant Equitable's motion for leave to file.

the plaintiff and against the defendant. *Andrews v. Dravo Corp.*, 406 F.2d 785, 789 (3d Cir. 1969); *Delaware & H. R. R. v. Bonzik*, 105 F.2d 341, 344 (3d Cir. 1939); *Baltimore & O. R. R. v. Muldoon*, 102 F.2d 151, 152 (3d Cir. 1939).

Until shortly before the alleged interference, plaintiff was an agent of Equitable under a written contract in which he "agree[d] not to submit to any other company proposals for any forms of policies or annuity contracts, of a class of business issued by [Equitable], unless authorized by [Equitable]." In return, Equitable provided plaintiff with office space, secretarial services, telephone, stationery, and technical advice and assistance.

In May 1970 plaintiff solicited Nick Manganas for the purchase of an Equitable life insurance policy. Thereafter, Equitable paid for two physical examinations of Manganas, performed on May 29 and July 9, 1970. The expense of a third examination, conducted on August 3, 1970, was borne at least in part by Equitable. During May and June 1970, Jay Harrison, a specialist employed by Equitable, was called in to assist plaintiff by formulating a plan of insurance tailored to achieve specific objectives of Manganas.[2] On July 17, 1970, Manganas signed a formal application for insurance with Equitable. Unknown to Equitable, plaintiff had on the day before met with Gerald H. Bertelotti, Jefferson Standard's local manager, and secured from him a blank application for insurance with that company which plaintiff had Manganas complete on August 1, 1970.

On August 20, 1970, plaintiff executed a broker's contract with Jefferson Standard and ordered insurance contracts issued by both Jefferson Standard and Equitable. On August 28, 1970, Equitable made available to plaintiff a policy is-

2. Manganas was concerned with eliminating a cash surplus in his privately owned corporation. Harrison was joined by Robert A. Cleary, Director of Equitable's advanced underwriting for the Eastern division, in formulating the plan and assisting plaintiff.

sued to Manganas subject to payment of the first premium. Plaintiff resigned as agent for Equitable on August 31, 1970, effective September 1, 1970. On September 1, 1970, plaintiff signed an agency contract with Jefferson Standard which provided him with significantly more emoluments than his contract with Equitable. Subsequently, on September 5, 1970, Jefferson Standard delivered its policy to Manganas, at which time Manganas tendered a check for one-half the first premium.

When Harrison discovered that a Jefferson Standard policy had been delivered and learned for the first time that Jefferson Standard was competing with Equitable, he promptly called Manganas' accountant for verification and was referred to Manganas himself. Harrison's telephone conversation with Manganas constitutes the alleged interference on which this action is based.

The jury permissibly could have found that Harrison, in explaining the differences between the Equitable and Jefferson Standard policies, told Manganas that the Jefferson Standard policy would "hurt [him] more than help [him]." The jury further could have found that Harrison volunteered the advice that Manganas could stop payment on his check to Jefferson Standard until the merits of the two policies could be reevaluated. Manganas thereupon consulted with his accountant and his attorney, and then stopped payment on the check. Several days later, after meeting with representatives of Equitable and Jefferson Standard, Manganas concluded that both insurance companies were lying to him and decided not to purchase insurance from either. Because a sale was not consummated, plaintiff did not receive a commission.

■ Both parties assume, as did the district court, that Pennsylvania law governs this case. The Jefferson Standard policy, with which Equitable allegedly interfered, was delivered in Pennsylvania. Moreover, although Harrison apparently placed his call to Manganas from Virginia, Manganas received the call and cancelled the Jefferson Standard policy in Pennsylvania. We therefore believe that Pennsylvania has the greatest interest in the resolution of the issues presented in this case and that its law is applicable. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Neville Chem. Co. v. Union Carbide Corp., 422 F.2d 1205, 1211 (3d Cir. 1970); Griffith v. United Air Lines, Inc., 416 Pa. 1, 10–25, 203 A.2d 796, 800–07 (1964).

Despite contrary inferences which might be drawn from the meager and vague allegations in the complaint, the theory of plaintiff's action is essentially that Equitable interfered with plaintiff's contractual relations with Jefferson Standard. The corollary alleged is that Equitable's interference with the insurance contract between Jefferson Standard and Manganas *ipso facto* interfered with plaintiff's contract with Jefferson Standard for a sales commission. The theory of the defense was twofold: first, that plaintiff's negotiations for the sale of the Jefferson Standard policy to Manganas were in direct violation of his written agency contract with Equitable and in dereliction of his duties as an agent; second, that the telephone conversation of Equitable's employee, Harrison, was privileged and did not constitute interference with Jefferson Standard's insurance contract with Manganas.

■ Pennsylvania closely follows the Restatement in defining the tort of interfering with contractual relations. Lanard & Axilbund, Inc. v. Binswanger, 212 Pa.Super. 350, 356, 242 A.2d 912, 914 (1968). The Restatement provides that

one who, without a privilege to do so, induces or otherwise purposely causes a third person not to

(a) perform a contract with another, or

(b) enter into or continue a business relation with another

is liable to the other for the harm caused thereby.

Restatement of Torts § 766 (1939).[3] In Birl v. Philadelphia Electric Co., the Pennsylvania Supreme Court expressly adopted the Restatement definition and enumerated its elements. 402 Pa. 297, 301, 167 A.2d 472, 474 (1960).

> [T]he actor must act (1) for the purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result.

*Id.* The question on this appeal is whether the plaintiff adduced sufficient evidence to support the jury's finding of an absence of privilege.[4]

The Pennsylvania Supreme Court recently dealt with the issue of privilege in Glenn v. Point Park College, 441 Pa. 474, 481–82, 272 A.2d 895, 899 (1971). In the course of its opinion, the court cited with approval section 768 of the Restatement which defines the privilege of a competitor.

> § 768. Privilege of Competitor.
>
> (1) One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if
>
> (a) the relation concerns a matter involved in the competition between the actor and the competitor, and
>
> (b) the actor does not employ improper means,[5] and
>
> (c) the actor does not intend thereby to create or continue an illegal restraint of competition, and
>
> (d) the actor's purpose is at least in part to advance his interest in his competition with the other.

> (2) The fact that one is a competitor of another for the business of a third person does not create a privilege to cause the third person to commit a breach of contract with the other even under the conditions stated in Subsection (1).

Restatement of Torts § 768 (1939).

▪ In determining the scope of a competitor's privilege, the law seeks to foster competition while simultaneously protecting existing contract obligations. In this case, we also are confronted by another fundamental policy of the law which requires an agent subject to a duty to his principal "to act solely for the benefit of the principal in all matters connected with the agency." Restatement (Second) of Agency § 387 (1957). He may, therefore, as comment (b) to section 387 observes, "take no unfair advantage of his position in the use of information or things acquired by him because of his position as agent or because of the opportunities which his position affords." Pennsylvania has adopted this view.

> An agent owes a duty of loyalty to his principal, it is his duty in all dealings affecting the subject matter of his agency, to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal.

Kribbs v. Jackson, 387 Pa. 611, 619, 129 A.2d 490, 494 (1957); *accord,* Sylvester v. Beck, 406 Pa. 607, 610, 178 A.2d 755, 757 (1962).

▪ Even without any specific agreement, but in recognition of an agent's

---

3. It is not altogether clear that plaintiff falls within the reach of the language of section 766 of the Restatement of Torts since the breach he alleges is not of his contract with Jefferson Standard but of the contract between Manganas and Jefferson Standard. Plaintiff may be a third-party beneficiary of the latter contract but it is not clear that section 766 protects third-party beneficiaries. Assuming arguendo that it does, plaintiff may not recover for reasons we state later in this opinion.

4. Plaintiff asserts on appeal that consideration of the privilege issue is foreclosed by Equitable's failure to plead privilege as an affirma-

tive defense in its answer. Contrary to this assertion, however, the burden of pleading and proving the absence of privilege lies with the plaintiff under Pennsylvania law. Barlow v. Brunswick Corp., 311 F.Supp. 209, 212–13 (E.D.Pa.1970); Glenn v. Point Park College, 441 Pa. 474, 482, 272 A.2d 895, 900 (1971).

5. Plaintiff does not assert on appeal that Equitable employed improper means but relies solely on his contention that Equitable's actions were not privileged under section 768(2) of the Restatement.

duty of loyalty to and fair dealing with his principal, an agent is, unless otherwise agreed, "subject to a duty not to compete with the principal concerning the subject matter of his agency." Restatement (Second) of Agency § 393 (1957). In this instance, plaintiff specifically agreed, in the "prior right" provision of his written contract with Equitable, "not to submit to any other company proposals for any forms of policies or annuity contracts, of a class of business issued by [Equitable], unless authorized by [Equitable]." Nonetheless, plaintiff deliberately and methodically embarked upon a plan to bring a competing company into the sales arena. Plaintiff admitted under cross examination:

Q: When this idea of the insurance for Mr. Manganas arose, the company you were dealing with and for was the Equitable only?

A: Yes.

Q: And you yourself brought the Jefferson Standard into the matter?

A: Yes sir.

Plaintiff personally generated the competition between the two companies to advance his personal interests, in violation of his written commitment to Equitable and of his duty to deal fairly and honorably with his principal.[6] He permitted Equitable to pay for his office facilities and for medical examinations of the prospect when, in fact, he was engaged duplicitously in bringing Jefferson Standard into competition for the business. Under such circumstances, the wail of a double agent, who has subverted his duties and obligations to his principal, that counteractivity by his principal is unprivileged violates our instincts of fair dealing and justice. In the present case, Harrison merely took one last opportunity, upon discovery of plaintiff's duplicity, to state his views to Manganas free from the impediment of the wayward agent.

■ We hold, therefore, as we believe Pennsylvania would, that the privilege to compete and cause a third person not to continue the relationship with a competitor is not terminated when the contract with the competitor is the direct product of an agent's breach of duty to his principal. The sanctity of the later contract may not be preserved at the expense of the breach of the first.

Because careful study of the record has failed to reveal sufficient evidence to negate the existence of privilege and thus support the jury's verdict, we need not reach appellant's other arguments. The judgment of the district court will be reversed and the case remanded with instructions to enter judgment in favor of the defendant.

KALODNER, Circuit Judge (concurring).

I agree with Judge Rosenn's conclusion that the record fails to negate the existence of privilege and thus requires reversal of the judgment entered by the district court in favor of the plaintiff

---

**6.** Although not raised in the pleadings or pretrial stipulation, plaintiff attempted at trial to justify his actions on the basis that "brokering out" of insurance contracts to other companies is a custom among insurance agents. Even assuming such a custom prevails generally, however, the custom was abrogated with respect to plaintiff by the specific language of the "prior right" clause in his agency contract with Equitable. Moreover, because the "prior right" clause and the alleged custom simply are irreconcilable, we cannot interpret the "prior right" clause in the light of this custom without rendering the contractual provision a nullity. Recognizing this, the trial court properly sustained Equitable's objection to testimony concerning the custom, although some ref- erence to the custom did seep into the record. The contractual provision must govern.

Plaintiff does not raise on appeal, nor did he raise at trial, the question whether Equitable waived compliance with the "prior right" clause. Equitable's agency manager in Pittsburgh, Frank Hill, apparently learned of plaintiff's breach of duty between August 20 and 25, 1970. We note that Hill gained this knowledge indirectly long after plaintiff entered preliminary negotiations with Jefferson Standard (July 16) and secured from Manganas an application for insurance with Jefferson Standard (August 1). Moreover, nothing in the record supports the theory that Hill waived or had authority to waive Equitable's right to plaintiff's exclusive services.

and remand with directions to enter judgment in favor of the defendant.

I would reverse the district court's judgment with directions to enter judgment in favor of the defendant for this further independent reason:

The plaintiff breached his contract with the defendant when he wrote the Jefferson Standard Life Insurance policy without the defendant's prior approval and this constitutes an illegal bargain unenforceable as to its fruits.[1]

Section 576 of the Restatement of Contracts, captioned "Bargain Requiring Breach of a Contract With a Third Person" provides:

"A bargain, the making or performance of which involves breach of a contract with a third person, is illegal."

Comment a of Section 576 states:

"Since breach of contract is a legal wrong, a bargain that requires for its performance breach of a contract with another, is opposed to public policy."

Paragraph 4 of the Comment's "Illustrations" fits the instant situation like a glove. It says:

"A bargains with B to serve as B's agent during a term of three years and not to engage as agent for any other principal during that time. During that term A makes a contract to serve as C's agent. This contract is illegal since the making of it involves a breach of the former contract."

Here, as Judge Rosenn points out, plaintiff's contract with the defendant provided in Article VIII that plaintiff undertook not to submit a policy "to any other company . . . unless authorized" by the defendant, and the plaintiff breached this contractual provision.

Pennsylvania's Parole Evidence Rule made unavailable to the plaintiff the contention that it was the "custom" of insurance brokers to disregard contractual exclusivity provisions. Universal Film Exchanges, Inc. v. Viking Theatre Corporation, 400 Pa. 27, 161 A.2d 610 (1960). It was there held:

"The law is well settled that where, as here, the terms of a contract are clear and unambiguous, *evidence of a custom to the contrary is inadmissible to vary those terms.*" 400 Pa. at 41, 161 A.2d at 619. (emphasis supplied).

In the instant case the terms of Article VIII are "clear and unambiguous" in every respect.

ALDISERT, Circuit Judge (dissenting).

Justice Frankfurter would teach us that "[i]n law . . . the right answer usually depends upon putting the right question."[1] If the question is, as Judge Rosenn states in his opening sentence, "whether the acts of the defendant come within the privilege to interfere with the contractual relations of a competitor," much leeway is provided to frame the answer. If, as stated nine paragraphs later by Judge Rosenn, "[t]he question on this appeal is whether the plaintiff adduced sufficient evidence to support the jury's finding of an absence of privilege," the parameters for furnishing the answer are severely circumscribed. I am in complete agreement with the latter statement of the issue before us. Thus, the function of this reviewing court is simply to evaluate the quantum of evidence.

The jury has found the facts contrary to the defendant's contention. Therefore, I cannot begin to characterize plaintiff as a "wayward agent" or a "double agent" being "engaged duplicitously" "who has subverted his duties and obligations to his principal."[2] These characterizations sound more like the felicitous phrasings of a defense counsel's closing argument to a jury, than a dispassionate account of facts found in favor of the *plaintiff.* And, as properly stated by Judge Rosenn, the evidence must be considered "in the light most favorable to plaintiff, drawing all rea-

---

1. Suburban Gas Company v. Wagner, 155 Pa. Super. 52, 54, 37 A.2d 23, 24 (1944).

1. Rogers v. Commissioner, 320 U.S. 410, 413, 64 S.Ct. 172, 174, 88 L.Ed. 134 (1943).

2. Opinion of Rosenn, J., at 1077.

sonable inferences in favor of the plaintiff and against the defendant." [3]

Plaintiff presented evidence that:

1. He was an independent contractor of defendant, and that the employment agreement provided: "Nothing contained herein shall be construed to create the relationship of employer and employee . . . ." Appendix at 23a, 233a.

2. Notwithstanding an exclusivity provision in agency agreements, there was a custom of Equitable agents "brokering out" cases to other companies.

3. For a period of months plaintiff solicited Manganas for a $1,000,000 life insurance policy, eventually offering him a choice between policies issued by the defendant company and Jefferson.

4. Manganas conferred with his accountant and his lawyer who advised that the Jefferson Standard policy better suited his needs.

5. Manganas chose the Jefferson Standard policy, relying on the advice of his accountant and lawyer, "more likely [the advice of his] attorney." *Ibid.* at 93a.

6. Manganas wrote a check in the amount of $17,615 and delivered it to plaintiff as an initial partial premium payment for the Jefferson Standard Insurance policy.

7. After the offer and acceptance of the Jefferson Standard Insurance policy, and the delivery of the check to plaintiff, the defendant company's representative Harrison told Manganas that the Jefferson policy "is going to hurt [him] more than help [him] for the purpose [he] was getting insurance-wise," *ibid.* at 95a, and when Manganas told him he had issued a check for it, Harrison told Manganas, "Well, you can cancel the check." *Ibid.* at 96a.

8. Manganas cancelled the check, called off the insurance deal, and plaintiff was deprived of the commission.

Thus, I believe sufficient evidence was presented for the jury to determine whether there was a privilege to act, Restatement of Torts § 767 (1939), and whether the "actor's conduct [was] justifiable under the circumstances." *Ibid.,* Comment *a.* The jury was required to decide whether the "relation concern[ed] a matter involved in the competition between the actor and the competitor." *Ibid.,* § 768(1)(a). Specifically, they had to decide:

1. The nature of the actor's [Harrison's] conduct, *ibid.,* § 767(a); and

2. Whether the competition between Jefferson and Equitable was still ongoing or had terminated upon the offer and acceptance of the Jefferson contract by Manganas. *See ibid.,* § 767(c) and Comment *d.*[4]

The jury obviously found that the competition had ceased and that the relation did not concern a matter involved in competition. The majority, however, would nullify the jury's fact findings and substitute their findings of fact couched in terms of a legal principle as to "whether the actor's conduct is justifiable under the circumstances." The incongruity of the majority position is manifest. The majority hold: "the privilege to compete . . . is not terminated when the contract with the competitor is the direct product of an agent's breach of duty to his principal. The sanctity of the later contract may not be preserved at the expense of the breach of the first."[5] But for the breach of the first, there would be no competition to give rise to the claimed privilege. Thus, the majority sanction the breach of the first to give rise to the privilege, but condemn the breach of the first when the resulting competition culminates in a contract ending the competition.

---

3. *Ibid.* at 1074.

4. "A may be privileged to induce B not to deal with C, A's competitor, and be unprivileged to induce him in the same way not to deal with D

who is not a competitor." Restatement of Torts § 767, Comment *d,* at 69 (1939).

5. Opinion of Rosenn, J., at 1077.

Denying plaintiff recovery as a matter of Pennsylvania law runs counter to the current approach to tort liability in that state. What was said in Quinones v. United States, 492 F.2d 1269, 1278–79 (3d Cir. 1974), is also appropriate here. "In recent years we have witnessed rapid, if not revolutionary, development in judge-made tort law by Pennsylvania courts . . . expanding and not contracting liability of defendants and increasing recoveries for plaintiffs. Thus there is nothing in principle, nor precedent, nor manifest in the contemporary jurisprudential philosophy of Pennsylvania courts which would tend to foreclose plaintiff's course of action in this case."

Moreover, intrusion into the jury's province runs counter to the spirit, if not the letter, of federal procedures. "The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury." Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 537, 78 S.Ct. 893, 901, 2 L.Ed.2d 953 (1958) (footnote omitted).

A subordinate issue injected by the majority *sua sponte* after the original briefing by the parties was whether, as a matter of law, plaintiff was "in direct violation of his written agency contract with Equitable" not to broker out insurance with other companies.[6] At trial, time and again, the insurance company successfully resisted plaintiff's efforts to introduce evidence of a custom in the insurance industry for agents operating under a "prior right" clause of an agency contract to broker business with other companies. But evidence of this custom eventually became part of the record.

As set forth in appellant's supplemental brief, plaintiff attempted to show custom, and ostensibly waiver, by Equitable of the exclusivity provisions of the agency contract. If the "prior right" of plaintiff's agency contract is relevant—and Judges Rosenn and Kalodner think so—then it was the *plaintiff,* not the appellant, who was harmed by trial court rulings. He sought to show by extrinsic evidence that it was customary for agents with this type of contract to broker insurance to other companies. If this were accompanied by proof of knowledge by appellant, a factual issue of waiver by the appellant would have been joined properly for jury consideration under proper instructions by the court.

I cannot subscribe to Judge Kalodner's attempt to remove this issue from the jury by applying strictures of the Pennsylvania parol evidence rule to Restatement of Contracts § 576. The purpose of the parol evidence here was not to "vary" the terms of the contract. Universal Film Exchanges, Inc. v. Viking Theatre Corp., 400 Pa. 27, 161 A.2d 610 (1960). Rather, it was to show that a provision of a written contract had been abandoned by waiver. As Justice Musmanno colorfully expressed this principle in Wagner v. Graziano Construction Co., 390 Pa. 445, 448, 136 A.2d 82, 84 (1957): "Even where the contract specifically states that no non-written modification will be recognized, the parties may yet alter their agreement by parol negotiation. The hand that pens a writing may not gag the mouths of the assenting parties." *See also* Simons v. Safety Mut. Fire Ins. Co. of Lebanon, 277 Pa. 200, 203, 120 A. 822, 823 (1923); Achenbach v. Stoddard, 253 Pa. 338, 343, 98 A. 604, 605 (1916); Grove v. Donaldson, 15 Pa. 128, 136–37 (1850); De Long Hook & Eye Co. v. Tait, 108 Pa.Super. 369, 373, 164 A. 848, 849 (1933); 14 Pa.L.Encycl., Evidence § 291, at 632–33 (1959).

I would affirm the judgment of the district court.

---

6. *Ibid.* at 1075.