See also D.C., 244 F.Supp. 508.

**William ANDREWS, Plaintiff,**

**v.**

**DRAVO CORPORATION, Defendant.**

**Civ. A. No. 65–015.**

United States District Court
W. D. Pennsylvania.

Jan. 8, 1968.

Hymen Schlesinger, Pittsburgh, Pa., for plaintiff.

Bruce R. Martin, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

MARSH, District Judge.

The plaintiff, William Andrews, a seaman, brought this civil action against Dravo Corporation, his former employer, under the Jones Act and general maritime law to recover damages for aggravation of a serious vascular disease and premature total and permanent disability, allegedly resulting from the defendant's breach of obligation to properly care for plaintiff despite its knowledge of his disease and two shipboard injuries aggravating it, and from defendant's breach of obligation to furnish him with maintenance and cure. One injury was sustained in May or June, 1962, and the other in February, 1964; both were caused by accidents attributed to negligence and unseaworthiness; both caused pain, suffering and loss of earning power. An amended complaint added a third count for maintenance and cure for the injuries and disability, and reiterated a claim for damages "for failure to furnish maintenance and cure which has seriously and severely aggravated and prolonged plaintiff's injuries and disabilities and has caused him great and continued pain and suffering and starvation, loss of wages and impairment of earning power and counsel fees for which additional damages are claimed * * *"

After trial, the jury returned two verdicts in favor of plaintiff: $30,360 under the Jones Act and $6,745 for maintenance and cure, on which judgments were entered.

The defendant timely filed a "Motion for Judgments in Accordance with Motion for Directed Verdict as to Portions of Plaintiff's Claims", and a "Motion for a New Trial" in the liability action and also in the maintenance and cure action. In our opinion, the motions should be denied.

Dravo contends that it is entitled to judgment n. o. v. as to portions of the plaintiff's claims because under the evidence Andrews did not prove the bulk of his claims for damages and for maintenance and cure. At the trial Dravo introduced no testimony; the apparent defense strategy was to rely on the substantial difficulty in proving the effects of the two injuries upon the plaintiff's vascular disease.

Of course, when probing the record to determine whether there is any merit to the defendant's prayer for judgment n. o. v., the court is bound to accept the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff, Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944), and draw all reasonable inferences against the defendant, Makowsky v. Povlick, 262 F.2d 13 (3d Cir. 1959).

Unknown to either party in 1962, Andrews was suffering from diabetes mellitus and a vascular disease variously characterized as atherosclerosis, arteriosclerosis, thromboangiitis obliterans, arteriosclerosis obliterans, arteriosclerotic occlusive disease, Raynaud's disease, and Buerger's disease.

One day in May or June, 1962, while working on defendant's towboat, Andrews slipped on some gravel which defendant negligently permitted to lie on a gunnel where he had to walk and injured his little toe when it struck a brace or pump box. He reported the injury to Captain Rogers. He finished his hitch and left the vessel, but when recalled to work a week later the toe was sore, swollen and discolored. He exhibited the toe and foot to Captain Rogers. The Captain did not offer him medical attention nor send him to the defendant's dispensary, or to a doctor, but instead permitted him to go home to Cambridge Springs, Pennsylvania.

Andrews went to Dr. Verinisi in Cambridge Springs, his family doctor, who

was an osteopath. Dr. Verinisi diagnosed his condition as dry gangrene due to arteriosclerosis.

Later, on August 29th, September 17th and September 26th, Andrews was examined by defendant's doctors at the defendant's dispensary. On the last mentioned day, Dr. Marshall, the doctor regularly employed at the dispensary, diagnosed his condition as "serious peripheral vascular deficiency and thromboangiitis obliterans". Tests indicated "that you probably are diabetic which would complicate your present illness".[1] At no time did defendant's doctors treat him or secure for him the specialized treatment which his condition called for;[2] instead he was told to return to his family doctor who then hospitalized him in the Erie Osteopathic Hospital where he was treated for diabetes and his other ailments. See Exhibit 2.

In November, 1962, the defendant negligently permitted Andrews to return to work as a deckhand (T., pp. 246, 247, 300, 329, 330). In permitting him to do so Dr. Marshall reported: "Pulsation not palpable in lower leg (left)—he mentions symptoms suggestive of mild intermittent claudications." He specified that Andrews should dress his feet warmly and wear safety toe shoes.[3]

From the evidence the jury could reasonably have inferred that from the time the defendant's captain saw Andrews' inflamed toe, the defendant breached its obligation to provide him with the specialized medical care required by his serious vascular condition; and that this breach, plus the negligent permission to return to heavy work, aggravated the disease and hastened the onset of his total and permanent disability (T., pp. 240–241, 305–307, 315–316, 318, 323, 328, 331).

It is true that there was medical testimony that Andrews was totally and permanently disabled when, after the toe injury, his vascular disease was discovered, but in context the jury quite properly could have inferred this to mean that he should not have been permitted by the defendant's doctor to resume the heavy work of a deckhand,—not that he could not do the work under economic pressure. As a matter of fact, he was negligently permitted by defendant to work, except for several weeks absence because of the second injury, from November, 1962, to June 2, 1964, as a deckhand, regardless of his precarious physical condition, thus saving the defendant the expenses attendant upon maintenance and cure.[4]

---

1. Plaintiff's Ex. 5.

2. Excerpt from direct examination of Dr. M. A. Sherman (T., pp. 242–244):

   "Q Doctor, where a person has an arterio obliterans condition, what treatment is indicated?

   "A Well, treatment should be instituted as quickly as possible. Of course, there should be avoidance of smoking and avoidance of extreme temperatures, and Pauxfood given to cause a negative pressure, and blood thinners such as Dicumeral or Hepparene.

   Also, Typhoid Fever Vaccine should be given intramuscularly, between 50,-000 and 100,000 units, increasing it up to 200,000 over a period of five to ten days. Also, vasal dialants which will cause a dialation of the vessels.

   And, of course, drugs for pain which they are going to get, and injections of pure alcohol in the lumbar area, or what they call a sympathectomy, cutting the patient across the abdomen to cut the nerves to the legs so he doesn't have so much discomfort and pain.

   And, limitation of walking, only up to tolernce. I mean by that that whenever they walk a few blocks and they get pains in the calves of their legs, they should stop and rest and not just force through.

   "Q Now, does that treatment require the supervision of a physician?

   "A Oh, yes, definitely.

   "Q Should it be under a general practitioner or a specialist?

   "A Under a man who is a surgeon who is qualified to do that kind of work, or a man specializing in vascular diseases."

3. Exhibit 5. Dr. Marshall was not called as a witness.

4. A shipowner should not be permitted to minimize his liability for maintenance and cure and force the seaman back to work.

Upon his return to work in November, it was not disputed that Andrews "was having a hard time of it"; he was limping and complaining (T., pp. 38, 39, 71).

During this period, on February 21, 1964, while working on defendant's towboat, due to the negligence of Captain Woods who was maneuvering the vessel and the tow out of the Emsworth Lock, the face wire slipped off a kevel and struck and fractured the thumb of Andrews' left hand. He reported the injury to Captain Woods, who negligently failed to send him for proper medical attention until the next morning. Again, no specialized medical care was given him for his vascular disease, and he was permitted to return home to Cambridge Springs with his hand in a cast.

Maintenance at the rate of $47.50 per week was paid for four weeks.

He was again permitted to return to heavy work as a deckhand in April, 1964, but was wrongfully discharged on June 2, 1964, after reporting sick with a virus.

■ Mr. Andrews became totally and permanently disabled several months after he was discharged in that his vascular disease had so progressed that he was unable to do any labor. The jury could have found from the medical testimony that the two injuries aggravated his disease; that the failure to furnish specialized medical care after each injury aggravated his disease; that permitting him to engage in heavy labor aggravated his disease; that the effect of defendant's negligences, singly and cumulatively aggravated his disease, caused him to lose wages until the time of trial and hastened his total disability (T., pp. 328, 331).

Dr. Sherman testified that there was a causal connection between the injury to plaintiff's foot and his total and permanent disability which this doctor found on his examinations of March 3, 1966 and May 20, 1967, and that the two injuries probably aggravated his condition and produced the disability. (See, for example, T., pp. 234, 238–241, 266, 303–307, 316, 318.)

Dr. Wolfe testified that he examined Mr. Andrews on two occasions and that the injuries sustained by Mr. Andrews aggravated his preexisting arterial disease; that he is totally and permanently disabled; and that this condition was hastened by the injuries. (See, for example, T., pp. 323, 325–326, 328, 331, 347–348.)

There was medical testimony that after the toe injury, the plaintiff should have had proper medical attention and should not have been permitted to work as a deckhand (T., pp. 246, 300, 358–359); Dr. Wolfe stated that if the patient had been given proper early treatment and had not sustained any injury, he could have performed work of a less dangerous nature (T., p. 360).

In addition to the medical opinions that the two injuries aggravated Andrews' condition and prematurely caused his total disability, there was medical opinion that there were curative techniques for impaired circulation known to medical science (T., pp. 282, 326–328).

It seems certain that arteriosclerosis is an incurable disease, but there was evidence that the effects of the disease upon the two injuries were cured by medical treatment; also the arterial blockages of the left and the right common iliac arteries, which occurred after plaintiff's discharge, were relieved by surgical operations; and his heart attack was relieved by medical treatment.

The defendant's briefs urgently point to statements elicited from the medical witnesses on cross-examination which it interprets as inconsistent with their opinions favorable to plaintiff. We think these inconsistencies, if they were such, were for the jury.

See: Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); cf.

Yates v. Dann, 223 F.2d 64 (3d Cir. 1955).

■ Where the evidence is conflicting and there is an issue for the jury, judgment n. o. v. should be denied.[5]

Andrews was employed as a seaman on defendant's ships for 15 years; since his vascular disease occurred during his service, we think defendant is liable for maintenance and cure until the point of maximum cure was reached. The defendant contends that plaintiff did not prove he maintained himself during those periods. There was evidence that plaintiff supported his mother and invalid sister; that when his income stopped, he continued to board and room with his mother paying her out of his insurance money and when that ran out, he incurred an obligation to pay her for his maintenance (T., pp. 112, 414–415, 417). We think there was sufficient proof in this respect to deny the motion for judgment n. o. v. as to maintenance and cure.

The defendant assigns 11 reasons for a new trial as to the liability claims and 7 reasons for a new trial as to the maintenance and cure claim. We do not find merit in any of them.

We think plaintiff was entitled to the adverse interest charge with respect to defendant's employees, Dr. Marshall, Cromling v. Pittsburgh and Lake Erie R. R. Co., 327 F.2d 142 (3d Cir. 1963), Captain Rogers and Captain Woods, none of whom were called to testify.

■ The size of the liability verdict is not excessive. The plaintiff seaman, although handicapped by disease, was capable of earning $6,000 a year prior to his total disability in 1964.[6] He was 53 years old at trial (T., p. 105). The jury evidently believed upon sufficient evidence that his total disability was to some extent accelerated by the negligences of the defendant and that his earning power was prematurely completely extinguished. Had the plaintiff been permitted to introduce the mortality tables, the verdict may have been considerably enhanced (T., pp. 395–396). In addition to loss of earning power, plaintiff's pain, suffering and inconvenience were considerable.

■ In our opinion the evidence was sufficient to support the verdict of $6,745 for maintenance and cure.[7] We think that the charge related the important factual issues posed by the evidence to the law of maintenance and cure. Without doubt Andrews was in the service of the ship when the toe on his left foot was injured in May, 1962, and it was then that defendant was obligated to offer him prompt and adequate medical treatment and maintenance. This it wholly neglected to do. Had it been done, the defendant's doctors probably would have discovered, as they did later in August and September, the existence of the dangerous vascular disease and diabetes. From May, 1962, Andrews was entitled to maintenance until maximum cure. The jury was instructed to deduct the 4-week period when he re-

---

5. Berry v. United States, 312 U.S. 450, 452–453, 61 S.Ct. 637, 85 L.Ed. 945 (1941); Jamison v. Di Nardo, Inc., 302 F.2d 27 (3d Cir. 1962); Brodrick v. Derby, 236 F.2d 35 (10th Cir. 1956); Stanek v. Cole, 178 F.2d 122, 125 (7th Cir. 1949); 35B C.J.S. Federal Civil Procedure § 1223; 88 C.J.S. Trial § 259d, e, pp. 707–710. Cf. Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 110, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959), wherein the court stated: "Though this case involves a medical issue, it is no exception to the admonition that, 'It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. * * * The very essence of its [the jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * * ' "

6. Exhibit 3 shows that plaintiff's gross earnings in 1963 amounted to $6,072.40.

7. Dr. Verinisi's bill was $95. Although the bill of the Erie Osteopathic Hospital was not offered in evidence, it appears that the rate was a modest $18 a day (Ex. 2).

ceived maintenance and to deduct the periods when he worked and when he was confined in the Veterans Administration hospitals at public expense.[8] These instructions may have been more favorable to the defendant than it had a right to expect. Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). The rate of maintenance was not stipulated (T., p. 399) and we think a reasonable amount per week was permissible in the discretion of the jury in the light of the proof.[9]

The plaintiff was entitled to maintenance until he was cured as far as possible. Under the evidence the date of maximum cure was a difficult question, but we think it was a question of fact for the jury to determine. There was evidence which established that plaintiff was cured of certain serious incidents of his vascular disease by care and treatment, and that certain curative medical techniques have helped him— whether such help was palliative or curative was for the jury to determine. Under the evidence we do not see how the court, without usurping the function of the jury, could say as of any specific date prior to trial that no further improvement in his condition could be expected. It seems certain that his underlying vascular disease is incurable but the duty of providing maintenance and cure extends to the time when no improvement in the condition of the seaman may be reasonably expected to result from nursing, care and medical treatment. In this case we think determination of that time was for the jury, and in that respect we think they were properly instructed. Cf. Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 110, 80 S.Ct. 173, 4 L.Ed.2d 142

(1959). The verdict indicates that the jury fixed a time of maximum cure prior to the end of the trial (see f.nn. 8 and 9, supra).

An appropriate order will be entered.

---

8. After his toe injury in May, plaintiff returned to work on November 21, 1962 and continued to work until his thumb injury on February 21, 1964. When his thumb healed, he returned to work for three hitches (T., p. 98) until discharged. Our computation at $47.50 per week indicates that plaintiff could have been awarded, consistent with the evidence, as much as $7,329.50 maintenance and cure to the last day of the trial.

9. It was proved that in 1964, defendant paid plaintiff $47.50 per week; with increased cost of living since 1964, the jury could have justifiably increased that rate to a reasonable extent.