**William ANDREWS**

v.

**DRAVO CORPORATION, Appellant.**

**Nos. 17167, 17168.**

United States Court of Appeals
Third Circuit.

Argued Sept. 27, 1968.

Decided Jan. 27, 1969.

Rehearing Denied March 21, 1969.

See also, D.C., 244 F.Supp. 508.

Bruce R. Martin, Pittsburgh, Pa., for appellant.

Hymen Schlesinger, Pittsburgh, Pa., for appellee.

Before BIGGS, FREEDMAN and VAN DUSEN, Circuit Judges.

OPINION OF THE COURT

BIGGS, Circuit Judge.

I.

Andrews, a former crew member on certain of Dravo's vessels, recovered a verdict and judgment for $6,745 for maintenance and cure and a verdict and

judgment for $30,360 as damages under the Jones Act.[1] The following appears from the evidence, taking the inferences most favorable to Andrews, and in substance is stated in the opinion of the court below denying Dravo's motion for a new trial. 288 F.Supp. 142, D.C. (1968). Andrews was employed as a deckhand upon Dravo's vessels on the Ohio River and its tributaries.[2] In June or July, 1962, Andrews slipped on gravel on a barge gunnell injuring his left little toe. He reported the injury to the barge captain. Andrews finished his hitch[3] and left the barge but went back to work on the same barge approximately a week later. His toe was then sore, swollen and discolored. Andrews showed the toe and foot to the barge captain who did not offer him medical attention or send him to Dravo's dispensary, readily available. Instead the captain allowed him to go to his home in Cambridge Springs, Pennsylvania. There Andrews consulted Dr. Verinisi, his family doctor, an osteopath. Dr. Verinisi diagnosed his condition as dry gangrene due to arteriosclerosis. On August 29, September 17 and 26, 1962, Andrews was examined by Dravo's doctors at its dispensary. On September 26 Dr. Marshall, at the dispensary, diagnosed Andrews' condition as "serious peripheral vascular deficiency and thromboangiitis obliterans".[4]

Tests showed that Andrews was also a mild diabetic which complicated his other prior existing illnesses. At no time did Dravo's doctors secure for him the spe-

1. Jurisdiction arises under the Jones Act, 46 U.S.C. § 688, and under maritime law.

2. In Count I of Andrews' complaint he alleges that in June or July, 1962 he injured his left foot while walking along a barge gunnel due to Dravo's negligence and the unseaworthiness of the barge, Dravo allegedly having failed to keep the gunnel free of gravel and other foreign substances; that the injury to his left foot aggravated his prior condition of diabetes, arteriosclerotic obliterans and cardiovascular illness and disability. Andrews also alleges that Dravo had knowledge or notice of his condition and illness and of the aggravation resulting from the injury, but nonetheless continued him at work and failed to furnish him with maintenance and cure causing his condition to become aggravated and his disability and illness to increase. In the second count Andrews alleges that in February or March 1964 he was injured when a face wire suddenly and without warning jerked and struck him on the left hand fracturing his left thumb, causing serious and permanent injuries and aggravating his pre-existing vascular and circulatory condition; and that Dravo is liable on grounds of both negligence and unseaworthiness. Andrews added a third count to his complaint by amendment claiming maintenance and cure and consequential damages for failure to furnish maintenance and cure which allegedly seriously aggravated and prolonged his injuries and disabilities.

The case was pretried, but there is no substantial variance between the allegations of the complaint and the issues as defined by the pretrial proceedings.

3. Seamen apparently served a "hitch" of seven days, living on the vessel. Upon the completion of each hitch the seaman was relieved of his duties for a period of time, but returned as called by Dravo for another hitch.

4. Enc.Brit. 374 (1967 ed.) states as follows: "Buerger's Disease (Thromboangiitis Obliterans) is a chronic and uncommon malady characterized by inflammation of the arteries and veins of the arms and legs. It is rarely fatal since it seldom affects vital organs. The cause is unknown, but tobacco has been implicated because most patients with this disease are heavy smokers, and abstinence from tobacco usually leads to improvement. Of the persons affected, 99% are men.

"The symptoms first appear between the ages of 20 and 45 years. The acute lesions of the veins are painful and subside spontaneously in a week or two but may recur. More serious is involvement of the arteries, because obstruction may occur which will interfere with the blood supply to the hands and feet. Symptoms include aching in the calves or arches when the patient walks, and coldness, blueness and painful ulceration or gangrene of one or more fingers or toes. Amputations of toes or fingers are sometimes necessary. Major amputations of arms and legs are seldom necessary, especially if the victim stops smoking."

cialized treatments which his condition required. He was told to go to his family doctor, Dr. Verinisi, who hospitalized him in the Erie Osteopathic Hospital where he received some treatment for diabetes and his other ailments. Dr. Marshall of Dravo's clinic stated that Andrews mentioned symptoms "suggestive of mild intermittent claudications." He told Andrews that he should dress his feet warmly and wear "safety toe shoes". Andrews was rehired by Dravo on November 19, 1962 and was returned to heavy work as a deckhand. This aggravated his diseases and hastened his total and permanent disability. It is undisputed that after his return to work in November 1962 Andrews was "having a hard time of it." He was limping and complaining.

On February 21, 1964 Andrews was still serving as a deckhand on a Dravo towboat. The captain was maneuvering the vessel with tow out of Emsworth Lock and a face wire slipped off a kevel and fractured Andrews' left thumb. He reported the injury to the captain who did not send him from the vessel for medical attention until the following morning. Again no specialized medical care was given him for his vascular diseases and he was permitted to return home with his hand in a cast. Maintenance at the rate of $47.50 was paid to Andrews for four weeks. He was permitted to return to heavy work as a deckhand in April 1964, but was discharged on June 2, 1964.[5]

Andrews became totally and permanently disabled several months after he was discharged, his vascular diseases having progressed to the point where he was unable to work. Dr. Sherman, testifying for Andrews, stated there was a causal connection between the injury to Andrews' foot and his permanent disability which Sherman found to exist on his examinations of Andrews on March 3, 1966 and May 20, 1967, and that the two injuries probably aggravated his condition and produced the disability. Dr. Wolfe, testifying for Andrews, stated that the injuries sustained by him aggravated his preexisting arterial diseases and that he was totally and permanently disabled. There was also medical testimony that after his toe injury Andrews should have had adequate specialized medical attention and should not have been permitted to work as a deckhand. Dr. Wolfe testified that if he had been given proper early treatment and had not sustained further damage to his circulation he could have performed work of a less dangerous nature. There was medical evidence that there were "curative" techniques known to medical science which might have been of aid to Andrews.

## II.

The first questions presented are whether the jury was entitled to find that the injury to Andrews' toe (1962) was caused by the negligence of Dravo's officers or the unseaworthiness of the barge, and whether the injury to his thumb (1964) was caused by the negligence of Captain Woods while putting Dravo's towboat and barges through the Emsworth Lock, in the light of the evi-

---

5. The following schedule we believe will be of value to the reader:

| | |
|---|---|
| June or July, 1962 | Toe injury. |
| November 19, 1962 | Returned to work until February 21, 1964, when thumb injury occurred. (Collected four weeks of maintenance and cure commencing last week in February.) |
| March, 1963 | By-pass graft. |
| April 1, 1964 | Returned to work. |
| June 2, 1964 | Discharged. (Some evidence as to virus.) |
| June, 1966 | By-pass graft. |
| January, 1967 | Heart attack. |

dence. The answers clearly are "Yes".[6] It follows that Dravo is liable for maintenance and cure for Andrews and was liable for damages under the Jones Act, 46 U.S.C. § 688.

The next question presented is whether or not Andrews, prior to his toe injury in 1962, had serious vascular disease and mild diabetes.[7] The record shows that at the time of the 1962 injury he had thromboangiitis obliterans, Buerger's disease.[8]

The next pertinent fact questions may be grouped together as follows: (1) Were Andrews' preexisting vascular diseases aggravated by his toe and thumb injuries; (2) did Dravo's failure to afford Andrews proper specialized medical care following the injuries aggravate his diseases; (3) did Dravo's causing Andrews to work as a deckhand aggravate his diseases; and (4) did the effects of the foregoing "singly and cumulatively," as the court below put it, aggravate his diseases? There was ample evidence to support the jury's [9] and the court's affirmative answers to the foregoing four questions.

There is no dispute that Andrews was discharged on June 2, 1964. Whether he was rightfully or wrongfully discharged is immaterial in respect to the issues here presented.[10] Following that discharge Andrews' condition continued to progressively deteriorate because of lack of care for his vascular disease. It was necessary for him to

have two operations at the Pittsburgh Veterans Hospital to cure blockage of arteries leading to his legs and he also had a heart attack which required two months' hospitalization. We state that on the present record the jury was entitled to find, as it apparently did find, that Andrews' total disability occurred after June 2, 1964 and that he reached the point of maximum cure after that date. As stated by the court below the verdict of the jury indicated that it found that the time of maximum cure occurred prior to the end of the trial on May 31, 1967.[11]

We are troubled by the fact that no exact point in time appears in the record at which it can be said with complete definiteness that Andrews reached the point of maximum cure. He is entitled to maintenance and cure to that point in time. The parties agreed that maintenance and cure would be paid at the rate of $47.50 a week and according to our calculation Andrews did not work 176 weeks between the time of his first injury, June or July, 1962, and the last day of trial, May 31, 1967, the period for which he claims compensation. Obviously if the jury had considered that his maximum cure occurred on the last day of trial they could have awarded him at least $2,000 more by way of maintenance and cure. *Cf.* note 9 cited to the text, 288 F.Supp. at 147. The amount of the Jones Act judgment lay in the hands of the jury and that body seems not to

---

6. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). That the negligent handling of a vessel will sustain a Jones Act claim requires no citation of authority.

7. We note that Andrews' doctor prescribed "Orinase" for Andrews' diabetes. Apparently his diabetes was not so severe as to require him to receive injections of insulin.

8. The court stated: "Unknown to either party in 1962, Andrews was suffering from diabetes mellitus and a vascular disease variously characterized as atherosclerosis, arteriosclerocis, thromboangiitis obliterans, arteriosclerosis obliterans, arteriosclerotic occlusive disease, Raynaud's

disease, and Buerger's disease." 288 F. Supp. at 143. We think that the statement quoted above was meant to be a finding that at the time of the toe injury and prior thereto Andrews had both vascular disease and diabetes. The record bears out this conclusion.

9. The court did not submit special interrogatories to the jury in accordance with Rule 49(b), Fed.R.Civ.Proc., 28 U.S.C.

10. The court below found that he was wrongfully discharged while he was suffering from a virus infection.

11. See notes 8 and 9 cited to the text, 288 F.Supp. at 147.

have exceeded a justifiable sum. But in any event we cannot usurp the province of the jury for it was the jury's duty under a proper charge, which the court gave, to settle this fact. Moreover Dravo does not attack, insofar as we can ascertain from its somewhat indefinite argument, the amount of the recovery for maintenance and cure but asserts that Andrews was not entitled to any recovery because he "encountered the risk of possible serious consequences from trivial injury every day he worked from November, 1962 to June, 1964 without suffering any of the possible serious consequences." We fail to perceive the force of this argument. Though it would have been preferable to have the jury fix a definite date we may not reverse the judgment for maintenance and cure on the ground of indefiniteness.[12]

■ Dravo seems to take the position that if there is a failure on the part of the ship or the shipowner to furnish proper medical attention to a sick or injured seaman and the seaman fails of cure or of improvement by reason of that neglect the shipowner is not liable in damages under the Jones Act. If these be the contentions of Dravo, they are untenable.[13] It is hornbook law that a seaman is a ward of the admiralty and if he becomes ill in the ship's service or is injured because of the ship's unseaworthiness or the negligence of the master or crew, the shipowner must furnish him adequate medical cure and is liable to him for damages. See the opinion of Mr. Justice Story in Harden v. Gordon, Fed.Cas.No.6,047, and Aguilar

v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943). In Murphy v. American Barge Line Co., 169 F.2d 61, 64 (3 Cir. 1948) Judge Goodrich stated: "[T]his duty on the part of the master to care for the seaman is one of the oldest and most conspicuous in the law of affirmative obligations." That there can be damages for breach of such an obligation has been well settled since Cortes v. Baltimore Insular Lines, Inc., 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368 (1932).[14] See Sentilles v. Inter-Caribbean Corp., 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959) and Gibson v. United States, 100 F.Supp. 954, 957 (E.D.Pa.1951), aff'd. per curiam, 200 F.2d 336 (3 Cir. 1952).

Dravo's quarrel seems to be with the evidence as well as with the law. Though it pays lip service to the principle that on a motion for judgment n. o. v. the court is bound to accept the evidence and all reasonable inferences in the light most favorable to the plaintiff, Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944), and draw all reasonable inferences against the defendant, Makowsky v. Povlick, 262 F.2d 13 (3d Cir. 1959), nonetheless it argues the facts as well as the legal principles and would in effect have us recast the jury's verdicts and disregard the able opinion of Judge Marsh. This we may not do.

Other issues raised by Dravo have been carefully considered but need not be discussed in this opinion.

The judgments will be affirmed.

12. The trial court stated, 288 F.Supp. at 147: "The plaintiff was entitled to maintenance until he was cured as far as possible. Under the evidence the date of maximum cure was a difficult question, but we think it was a question of fact for the jury to determine." We concur in this view.

13. The court has had difficulty in endeavoring to ascertain precisely what are Dravo's contentions in respect to Andrews' illness.

14. Mr. Justice Cardozo stated, Cortes v. Baltimore Insular Line, 287 U.S. at 371, 53 S.Ct. at 174: "If the failure to give maintenance or cure has caused or aggravated an illness, the seaman has his right of action for the injury thus done to him; the recovery in such circumstances including not only necessary expenses, but also compensation for the hurt. The Iroquois, 194 U.S. 240, 24 S.Ct. 640, 48 L.Ed. 955."