**EBERLE TANNING COMPANY,**
**Plaintiff,**

v.

**The UNITED STATES of America,**
**Defendant.**

**Civ. No. 69–363.**

United States District Court,
M. D. Pennsylvania.

May 19, 1972.

Herbert Odell, and Thomas V. Lefevre, Philadelphia, Pa., and Gerald Morrison, Rhoads, Sinon & Reader, Harrisburg, Pa., for plaintiff.

Stephen Lyons, and R. C. Ackerman, Trial Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

HERMAN, District Judge.

The matter before the court is the defendant's "Motion for Judgment Notwithstanding the Verdict and a New Trial, or in the Alternative for a New Trial on all Issues." The motion will be denied.

Plaintiff, Eberle Tanning Company, paid under protest an accumulated earnings tax for the fiscal years ending on October 31st 1964 and October 31st, 1965, in the amounts of $120,656.93 and $80,915.48, respectively and then sought in this suit a refund of the tax so paid, plus interest. The applicable provisions of the Internal Revenue Code of 1954 are Sections 531, 532, 533 and 537 which provide, in pertinent part:

> Section 531: "In addition to other taxes imposed by this chapter there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal . . . ."

> Section 532: "The accumulated earnings tax imposed by section 531 shall apply to every corporation . . . formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed."

> Section 533: "[T]he fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect

to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary."

Section 537: "For purposes of this part, the term 'reasonable needs of the business' includes the reasonably anticipated needs of the business."

The case was tried before a jury and by agreement of counsel the amount of the verdict if favorable to the plaintiff would be agreed upon, and the jury was asked to return a general verdict by answering the following questions:

1. Did the plaintiff, Eberle Tanning Company, permit its earnings and profits to accumulate beyond the reasonable present and future needs of the business?

   (a) During 1964, yes ——, no ——.

   (b) During 1965, yes ——, no ——.

(Answer the above questions for each year by placing an "X" after the word "yes" or "no" for each of the two years.)

2. If your answer to either part of question 1 above is "yes" then with respect to such year or years only, answer the following question either "yes" or "no" by placing an "X" after the appropriate word: Was one of the purposes for the accumulation the avoiding of income tax upon the shareholders of the plaintiff corporation?

   (a) During 1964, yes ——, no ——.

   (b) During 1965, yes ——, no ——.

The jury answered 1(a) "no" and 1(b) "no" and then, of course, did not answer "2".

In its motion now before the court the defendant complains only that the court should not have given plaintiff's suggested instruction No. 12[1] to the jury, and should have given defendant's suggested instruction No. 18.[2]

1. Plaintiff's proposed jury instruction No. 12:

"Eberle has introduced evidence with respect to a number of different needs for the accumulation of earnings—

(1) to provide funds for its normal working capital requirements;

(2) to provide funds for the restoration of its inventory to normal levels;

(3) to provide funds for plant alterations and replacement of equipment;

(4) to provide funds for pollution control;

(5) to provide funds for business contingencies or hazards such as threatened and actual strikes and volatile swings in the price of the commodities it uses to manufacture its product;

(6) to provide funds for a pension plan;

(7) to provide funds during loss periods which might be expected because of its own history of profits and losses and the cyclical nature of the tanning industry.

To the extent that Eberle has established any or all of these several needs by the preponderance of the evidence you should take such needs into account in the amount that you determined from the evidence was reasonably needed for this purpose. You should then compare the total of such needs with Eberle Tanning Company's accumulated earnings and profits at the time. If such needs exceed these accumulated earnings and profits, you should find for the plaintiff—Eberle Tanning Company—with respect to that year or years."

2. Defendant's proposed jury instruction No. 18:

"In reaching your decision, as to whether the corporation retained its earnings and profits for 1963 and 1965 beyond the reasonable needs of its business, you should compare the liquid assets available to run the business with the asset needs of the corporation. The asset needs, as I have already mentioned, include both the day to day operating needs and any reasonably foreseeable future needs. If the assets available exceed both of these needs, then the tax is to be applied against the lesser of the accumulated taxable income for the year or the excess assets. You will remember that Mr. Marenick presented such an approach. But, in comparing the assets available with the total asset needs, it is your decision as to how much of the assets were needed for the day to day operations. Likewise, it is your decision as to how much of the assets were needed for the reasonably anticipated future needs.

"I further instruct you that the retained earnings account is of no importance since a company may retain its earnings with impunity so long as those retained earnings have been translated into assets used in the business."

Defendant candidly points out that plaintiff's request No. 12 is a correct statement of the law which indeed it is, but objects to its having been read to the jury because "there was no explanation to the jury what the term accumulated earnings and profits means". The charge to the jury must be read as a whole and it appears to the court that the charge given here fairly and accurately explains the law to the jury which they applied to the facts as they found them to be. Ridgway Nat'l Bank v. North American Van Lines, Inc., 326 F.2d 934 (3d Cir. 1964); Gerhart v. Henry Disston & Sons, Inc., 290 F.2d 778 (3d. Cir. 1961).

The court is not bound to give any instruction submitted by any party but may give the instructions in the court's own language. Arkwright Mutual Ins. Co. v. Phila. Elec. Co., 427 F.2d 1273 (3d Cir. 1970); Don Kemper Co. v. Beneficial Standard Life Ins. Co., 425 F.2d 221 (3d Cir. 1970); Heiselmoyer v. P.R.R. Co., 243 F.2d 773 (3d Cir. 1957), cert. denied, 355 U.S. 833, 78 S.Ct. 47, 2 L.Ed.2d 44; McCormick v. New York Cent. R. R. Co., 222 F.2d 335 (3d Cir. 1955). There was no error in refusing defendant's proposed instruction No. 18, nor in giving plaintiff's instruction No. 12.

Defendant contends that the company had capitalized out of retained earnings $1,100,000 into the capital stock account and this was not taken into consideration by the jury in its verdict. In reviewing his notes of the testimony [3] the court can find no evidence that any amount of money was capitalized out of retained earnings.

The court has carefully reviewed the charge to the jury and finds no prejudicial error therein.

It was carefully pointed out to the jury that they were the sole judges of the facts; that it was their duty to apply the facts as they found them to the instructions of the court on the law; that it was their duty to consider all the instructions; that they had a duty to perform without bias or prejudice or sympathy or public opinion; that the fact that plaintiff was a private corporation and that defendant was the United States Government should not affect their verdict in any way; that the burden of proof was on the plaintiff as to all issues; that if proof failed to establish any essential element of plaintiff's claim by a preponderance of the evidence, then the jury should find for the defendant; that in passing on the credibility of the witnesses the jury should consider among other things the motive, state of mind, the interest and relation which each witness had to the case; that they should consider each expert's opinion; that although statistical data might bear some weight it was the facts and circumstances which existed with respect to the needs of the company for each year which should control their verdict.

At pages 21 and 22 of the charge, the jury was properly instructed:

"You may find that an accumulation of earnings is in excess of the reasonable present needs or the reasonably anticipated future needs of the business if it exceeds the amount that a prudent businessman, under all the the circumstances, would consider appropriate for the present business purposes or needs of the business, or for the reasonably anticipated future purposes or needs of the business.

"In order to justify an accumulation of earnings and profits for the reasonably anticipated future needs of the business, a corporation must have had specific, definite and feasible plans at the close of each of the years in issue for use of the earnings retained in the business. However, where the future needs are reasonable and foreseeable, but incapable of definiteness, and where specific plans cannot be made for these needs, other than to conserve a reasonable amount of capital, specific, definite and feasible plans are not so required. Such needs in-

3. The record has not been transcribed.

clude the foreseeable downswings in a business, threatened and actual strikes, volatile swings in the price of its raw materials and the decreasing market for the company's product. With respect to these needs, it is only necessary that they be reasonably foreseeable.

"On the other hand, in considering those needs which were capable of specific determination and definite planning, you must find, in determining whether Eberle had a specific, definite and feasible plan at the close of each of the years in issue for use of accumulated earnings and profits for such needs, that the plans were more than a nebulous desire to meet the problems or requirements of the business. In addition, the plans must be coupled with some action, some contemporaneous course of conduct directed toward the claimed objective. However, a closely held corporation is not held to the same strict formalities as a largely publicly held corporation. The fact that Eberle did not have formal written plans or include references in its corporate minutes to all of its business needs does not preclude you from finding that its retained earnings for such purposes were reasonable if you find that the contingencies were real, continuously present and in the exercise of sound business judgment could not be ignored at the close of each of the years in issue."

And, at pages 23 and 24 the jury was further instructed:

"Where an accumulation is for a specific project the fact that the project has not been carried out after a long period of time may be evidence that the accumulation was not made for this purpose . . . ."

And, again, at page 26:

"To the extent that a company seeks to justify its accumulation for anticipated expenditures, which expenditures are not intended to be made until some time in the future, you may consider the likelihood of earnings, if any, during the waiting period as a potential source for the necessary funds."

And, again, at page 27:

"If you find that Eberle Tanning Company did accumulate its earnings and profits beyond both its present and reasonably anticipated future needs for either of the years in question, you should then determine whether or not one purpose of that unreasonable accumulation was the avoidance of the payment of income tax at the shareholder level.

"By statute, Congress has provided that if you find a corporation did retain its earnings beyond its reasonable needs, there is a presumption that one purpose of the accumulation was to avoid income tax at the shareholder level. However, the plaintiff may rebut this presumption by establishing by a preponderance of all of the credible evidence that such tax avoidance was not one of the purposes for the accumulation."

On the whole the charge appears to be as favorable to the government as to the plaintiffs and, in any event, if any question as to the charge exists it is certainly not serious enough to disturb a verdict which was substantially supported by the evidence. Adams v. Ellenbrand, 341 F.2d 917 (4th Cir. 1965).

Eberle Tanning Company is a closely held corporation in which 50% of the stock is owned or controlled by the Eberle family, of Westfield, Pennsylvania, and the other 50% is owned or controlled by the Ellison family, of Boston, Massachusetts. The company tans hides for use in shoe leather. In a town of 1600 people this company is the principal employer, employing 250 persons. The company is 100 years old. It is on a fiscal year basis, its year ending on October 31st. In the fiscal years from 1950 to and including 1963, the company lost money in 8 years and made a profit in 6. During this period the company

paid a 7% dividend amounting to $84,000 in 1950; a 3% dividend amounting to $36,000 in 1954; and a 6% dividend amounting to $72,000 in 1955.[4] From 1956 through 1963, the company paid no dividend. During this period the company showed a profit in 1956 and 1957 and then suffered a loss in each of the years 1958, 1959, 1960, 1961, and 1962, but showed a small profit in 1963. This brings us to the first year now in question before this court—1964 in which no dividend was paid.

In 1964 the company showed a profit and paid an income tax of $24,357.42, which was at the maximum rate of 52%, but the United States Government assessed the accumulated earnings tax here in question in the amount of $105,000.37 on retained earnings of $3,894,966 (Px–2).

In 1965 the company again showed a profit and paid a dividend of 7% in the amount of $84,000 and paid an income tax of $266,377.21 which was at the maximum rate of 50% but the United States Government assessed the accumulated earnings tax here in question in the amount of $74,400.83 on retained earnings of $4,196,182 (Px–2).

Joseph Eberle, the president and a director of the company, who owns in his own name 25% of the stock and controls another 25%, which is in his father's estate but of which he is the beneficial owner, testified at length concerning the business of Eberle Tanning. The bulk of his testimony was uncontradicted but on the contrary was corroborated by other witnesses. He told the jury that in the tanning industry the hides were purchased for cash but that the money for the finished product came back to the company on an average of 37 weeks after the hides were purchased and that this then is the operating cycle for which the company must keep working capital. He estimated that the company should keep $5,000,000 as working capital and to enable improvements and carrying over bad years, but that the company prior to 1964 never had more than $4,500,000 at any one time. He pointed out how the price of hides fluctuated greatly; how the use of leather for shoe soles has dropped off because of the use of synthetics, rubber and plastics; how shoes were now imported from abroad, and how hides produced in this country are exported. He told the jury that between 50 and 60 tanneries went out of business since 1946, leaving only 10 or 12 remaining in the United States. He maintained that his company stayed in business because they were able to keep enough op-

4. From 1934 through 1967, the company paid dividends as follows:

| Year | % | Date | Amount |
|------|-----|-----------|----------|
| 1934 | 7% | 2– 1–34 | $ 56,000 |
| 1935 | 7% | 1–15–35 | 56,000 |
| 1937 | 7% | 10–27–37 | 84,000 |
| 1938 | 7% | 10–28–38 | 84,000 |
| 1939 | 7% | 10–31–39 | 84,000 |
| 1940 | 7% | 10–30–40 | 84,000 |
| 1941 | 7% | 10–31–41 | 84,000 |
| 1942 | 7% | 10–28–42 | 84,000 |
| 1943 | 7% | 6– 7–43 | 84,000 |
| 1943 | 10% | 10– 4–43 | 120,000 |
| 1944 | 10% | 6–28–44 | 120,000 |
| 1944 | 7% | 10– 2–44 | 84,000 |
| 1945 | 10% | 7– 3–45 | 120,000 |
| 1946 | 6% | 6–20–46 | 72,000 |
| 1946 | 10% | 12– 9–46 | 120,000 |
| 1947 | 15% | 7–21–47 | 180,000 |
| 1948 | 7% | 9–28–48 | 84,000 |
| 1950 | 7% | 12–28–50 | 84,000 |
| 1954 | 3% | 9–11–54 | 36,000 |
| 1955 | 6% | 1–10–56 | 72,000 |
| 1965 | 7% | 1–10–66 | 84,000 |
| 1966 | 7% | 1–10–67 | 84,000 |
| 1967 | 7% | 1–10–68 | 84,000 |

erating capital to sustain them over 2 or 3 bad years, and keep the plant running, retain customers and maintain good labor relations in a community which to a large extent depended on this tannery.

Eberle further testified that prior to 1964 the company had plans for improvements but because of the loss years of 1958, 1959, 1960, 1961 and 1962 were unable to make them. He then enumerated some of the improvements the company planned and the estimated costs:

1. The drying room needed improvements and in 1968–69 $100,000 was actually spent for this.

2. The rough drying loft required improvements which will cost approximately ½ million dollars, but these have not yet been done.

3. The beam house needed improvements and actually in 1967 and 1968 between $80,000 and $90,000 was spent in making these improvements.

4. The power house needed repairs and the boilers were obsolete ten years ago. It would cost $200,000 to replace them and a generator which is worn out could be replaced with a secondhand one for $50,000.

Disposing of tannery waste into a stream was a continuing problem and the Commonwealth of Pennsylvania threatened legal action against the company unless substantial steps were taken to correct this waste disposal problem. Eberle estimated $250,000 to $300,000 would have been required for this work and $100,000 was actually spent on it in 1966 and 1967. A retired Commonwealth Sanitary Engineer who had some authority over the company on this problem during the years in question, testified that the company did indeed have a problem and that from 1954 on the Commonwealth and the company were in continuous conferences in an attempt to find some feasible way to clean the waste from the stream, that in 1964 and 1965 Army engineers, Commonwealth engineers, and engineers employed by the company worked on the problem but, nevertheless, legal action was begun against the company in 1965. Finally, in 1968, an evaporation system was installed at great expense. This witness estimated that ½ million dollars would have been required in 1964 and 1965 to correct the condition.

Near the end of 1964 and extending into 1965 the tannery was on strike and as a result inventories fell considerably, requiring almost $2,000,000 to restore it to its normal level.

Plaintiff contends that because of all these things the company was justified in accumulating these earnings and not paying them out in dividends. Eberle pointed out that as long as he had been associated with the company [5] they paid dividends whenever they could; that he individually could certainly use dividends; that he would prefer to take dividends and that he was not the least concerned about paying income tax on dividends. Eberle also testified that no director had ever suggested to him that the company should not pay a dividend or should not pay a larger dividend because the shareholders would then have to pay a larger income tax.

William Ellison, who owned or controlled the other 50% of the stock, corroborated Eberle in much of the necessary repairs and lack of inventory because of the strike and fluctuating prices of hides, and then said that he was opposed to paying any dividend for 1964 because he did not think it would be wise to pay a dividend in the face of the conditions then existing in the business. And although he was in favor of the dividend for 1965, he was not in favor of declaring a larger one. He testified that the fact that he would have to pay a tax on any dividend he would receive did not affect him in his decisions on dividends in any way.

5. Eberle began working for the company in 1938 or 1939, and except for the years of World War II (1943 to 1946) when he served in the Navy, he was associated with the company in various capacities including general manager and president.

Harland Moore, the personnel director for the company, testified that in 1962 and thereafter, the labor union in the tannery was urging that the company institute a pension plan for hourly employees and that this would cost the company approximately $40,000 annually. In the negotiations in 1964, the failure of which led to the strike, the pension plan was demanded and it was this witness's opinion, in 1964, that such a plan would be required. Such a plan was adopted by the company but not until 1967.

John F. Eick, assistant superintendent of the tannery from 1962, corroborated Eberle on the planned repairs and improvements, and enumerated some of the moves the company made in 1964 and 1965 to put into effect the improvements.

Henry W. Rosenberg, an engineer for the company, corroborated Eberle on the cost and need for new boilers and the cost of correcting the waste disposal problem.

Irving R. Glass, an economist who had earned a Ph.D. in Economics and who had been associated with the Tanners' Council since 1946 and was familiar with this particular company, after reviewing the problems of the industry as a whole from 1963 through 1966 and considering these problems as they related to this company along with the additional problem of a strike and depleted inventory, gave his opinion that Eberle actually needed $4,700,000 as a minimum for working capital at the times in question.

The final witness for the plaintiff was James H. Fox, a Certified Public Accountant who for five years had been with the Internal Revenue Service as a "Tax Loss Specialist" dealing with the accumulated earnings tax, among other things, and who at the time of trial was the tax manager of the Baltimore office of Arthur Anderson Company, one of the largest organizations in the country dealing with tax matters. Fox said that, with one other man in the organization, he had final authority in accumulated earnings tax matters of their clients. He told the jury that he had examined the books of the plaintiff, analyzed the profit and loss statements and the balance sheets, considered the operating cycle and then gave as his opinion that for both 1964 and 1965 the company needed at least $4,375,000 as working capital and that this did not include money for improvements or changes or sewage control, or for replenishing inventory, nor the loss years previously experienced, nor the cost of a pension plan.

The defendant, on cross-examination of Wendell R. Freeman, a director of plaintiff company and treasurer of Proctor-Ellison, a partnership in Boston in which William B. Ellison was one of the principal owners, brought out that Proctor-Ellison which was the purchasing agent and sales agent for Eberle, frequently had as much as $1,000,000 of Eberle's money which they used in the Proctor-Ellison investment business paying interest to Eberle and that at the end of 1964 there was $900,000 in the account which belonged to plaintiff. It was also pointed out, however, that many times the balance was the other way to the extent of $800,000, and that when plaintiff needed the money from Proctor-Ellison they simply called for it. In August of 1965 Proctor-Ellison had $1,-500,000 of Eberle's funds and at the end of 1965 plaintiff had treasury bills of $1,300,000 and a credit balance with Proctor-Ellison of $700,000 but in Freeman's opinion this was just enough to get started again after the strike.

In cross-examination of Eberle it was shown that the corporation did not keep complete records of the director's meetings and there was nothing in the minutes of the January 7, 1965 meeting concerning the need for cash for losses nor for the sewage problem nor for operating expenses, nor for the beam house or drying room, nor for boilers or other improvements. It was also brought out that the plaintiff's claim for refund fail-

ed to list all of these matters and that in some listed the amounts suggested were quite different from those given in testimony.

The defense called Ellison and from his testimony it was revealed that for 1965 his personal income tax was $88,916 on income of $213,000, of which $198,000 came from dividends. He also paid a substantial tax in 1964.

Defense also called Joseph Eberle and it was disclosed that his taxable income for 1964 was $47,000 on which he paid a tax of $16,869, and for 1965 the taxable income was $50,000 on which he paid an income tax of $17,000.

Fred Klarman, another director of plaintiff company who had been employed by plaintiff since 1931, testified that at the end of fiscal 1964 the company had $916,000 with Proctor-Ellison and $693,722 in treasury bills, and at the end of 1965 $753,748 with Proctor-Ellison and $1,346,511 in treasury bills. Klarman testified, too, that the inventory at the beginning of fiscal 1964 and before any strike was anticipated was only $2,500,000. He further testified that nothing was "set up" on the books for planned expenditures for improvements.

The defense called Robert J. Marenick, a "Financial Analyst" who had a college degree having majored in accounting, and who had done some graduate work before going with the United States Government in January of 1970 in the Treasury Department. Shortly after starting with the government he began work on the Eberle case. After examining the books of the company Marenick concluded that at the end of 1964 the company had available to operate the business $4,309,000 and needed only $4,028,000, or that the company

had $282,000 that was not being used in the day-to-day business, and in 1965 it had available to operate the business $4,847,000 and needed only $4,130,000, or an excess of $718,000 not being used in the business. He further testified that from his examination of the books, he concluded that $3,600,000 was the sum needed for working capital. He concluded also that the treasury bills while normally classed as current assets or cash equivalent, should not be so considered here because he thought they were not being used in the business and should be considered investments.

■ Taking all of the evidence in the light most favorable to the plaintiff company as we must, Warner v. Billups Eastern Petroleum Co., 406 F.2d 1058 (4th Cir. 1969); Mroz v. Dravo Corp., 293 F.Supp. 499 (W.D.Pa.1968), aff'd, 3 Cir., 429 F.2d 1156; Adzigian v. Harron, 297 F.Supp. 1317 (E.D.Pa.1969); Andrews v. Dravo Corp., 288 F.Supp. 142 (W.D.Pa.1968), aff'd, 3 Cir., 406 F.2d 785; Cage v. New York Cent. R. R. Co., 276 F.Supp. 778 (W.D.Pa.1967), aff'd, 3 Cir., 386 F.2d 998, we conclude that the jury verdict cannot be disturbed.

■ It is true that had a dividend been paid in 1964 or a larger one paid in 1965, the shareholders would have paid a larger income tax, but neither this nor the fact that the company might have acquired working capital by financing are sufficient grounds to show that plaintiff unlawfully accumulated earnings. *See* R. Gsell & Co. v. C.I.R., 294 F.2d 321 (2d Cir. 1961); Elec. Regulator Corp. v. C.I.R., 336 F.2d 339 (2d Cir. 1964).

The defendant's "Motion for Judgment Notwithstanding the Verdict and a New Trial, or in the Alternative for a New Trial on all the Issues" will be denied.